*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 16, 2023

Plaintiff-Appellee,

v

No. 355976
Montcalm Circuit Court

BRIAN LEE STAPP,

LC No. 2020-026524-FC

Defendant-Appellant.

Before: RIORDAN, P.J., and MARKEY and REDFORD, JJ.

PER CURIAM.

A jury convicted defendant of assault with intent to commit murder (AWIM), MCL 750.83; third-degree fleeing and eluding, MCL 257.602a(3)(a); and five counts of resisting and obstructing a police officer, MCL 750.81d(1). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 50 to 75 years' imprisonment for the AWIM conviction, 6 to 20 years' imprisonment for the fleeing-and-eluding conviction, and 46 months to 15 years' imprisonment for each conviction of resisting and obstructing an officer. The sentences are to be served concurrently. Defendant appeals by right. We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The charges in this case arise from the efforts of several law enforcement officers to arrest defendant for domestic violence on February 22, 2020. Defendant's girlfriend at the time, KB, testified that she and defendant had an argument that night, and that during this argument, defendant punched her multiple times in the eye. KB called the police, and defendant fled. At approximately 11:30 p.m., Michigan State Police Troopers responded to KB's call. KB told them about the assault, and she showed her injuries to the troopers. She also gave them a description of defendant's vehicle, a black Jeep, and she identified three locations—including a two-track trail near Briggs Road—where they might find defendant. Several law enforcement officers joined in the search for defendant.

Trooper Jennifer Alway eventually located defendant on the two-track road. After following the track into the woods, she found defendant in a black Jeep. Trooper Alway was in a fully-marked police vehicle. She activated her lights, and, using her "PA system," she instructed

-1-

defendant to "[s]tay where you are." Rather than obeying the order, defendant drove the Jeep directly toward the patrol car. Trooper Alway—who was dressed in full police uniform—exited the patrol car with her firearm drawn. She yelled at defendant to "stop." Defendant did not stop; he looked at Trooper Alway and laughed. He continued driving, turning his wheels to drive around the patrol car. Trooper Alway holstered her weapon and got back in her patrol car to follow defendant.

After traveling on the two-track for a few minutes, defendant crashed his vehicle into a tree. He then jumped out of the Jeep and started to run. Again using her PA system, Trooper Alway ordered defendant to get on the ground. When he did not comply, she exited her patrol car to chase him, identified herself as a state police officer, and ordered defendant to get on the ground. Defendant continued to run, but because of icy conditions, he slipped. Trooper Alway caught him by the wrist and used an "arm bar take down" to bring him to the ground. Once on the ground, defendant struggled, ignored the trooper's commands, and tried to pull away from her. At one point in the struggle, Trooper Alway's right shoulder popped, and she described it as "immensely painful." As the struggle continued, defendant managed to get on top of Trooper Alway. As she lay on her back, defendant pinned her to the ground with his body and grabbed her wrists. He then tried to grab the trooper's Taser from her belt, but he was unable to get it released from the belt.

While still pinning Trooper Alway to the ground, defendant grabbed her throat with his hand and strangled her. During this time, Trooper Alway was "scared," and she had "a lot of troubling breathing." Defendant choked her for approximately five seconds, showing no signs that he was going to stop strangling her. Defendant only stopped choking the trooper because she punched the inside of his left elbow, causing him to release his grip. Throughout the assault, defendant laughed at her and told her that she was not tough. He stated several times that he was going to "punch" Trooper Alway "in the mouth." Defendant ordered her to "let [him] go." He also told the trooper that he was "gonna fuck [her] up." And he asked her, "Do you want to die here bitch?"

Still pinning her to the ground, defendant then punched Trooper Alway repeatedly in the face, near her eye. After the third punch, the vision in her left eye began to blur. As he punched her, defendant "appeared to be enjoying himself." Trooper Alway stated that she feared for her life. She did not believe that she would be able to get away from defendant on her own or that he would stop punching her. As defendant hit her, Trooper Alway could see headlights approaching, leading her to believe that other officers were coming to the scene.[1] Knowing that back-up would arrive shortly, Trooper Alway tried to restrain defendant—as she was being punched—by wrapping her legs around his back to hold him.

_____

[1] When she initially found defendant on the two-track, Trooper Alway notified the other officers that she had located him, and when he tried to drive away from her, she told them to cut defendant off where the two-track met Briggs Road. Not having heard from Trooper Alway in a while and concerned that she was not responding to communications, other officers headed toward Trooper Alway's location.

The first back-up officer to arrive was Trooper Austin Brown. Trooper Brown arrived to find defendant repeatedly striking Trooper Alway in the head, using what Trooper Brown characterized as "haymaker" punches. After ordering defendant to "get off her," Trooper Brown used his Taser on defendant, and he also inadvertently tased Trooper Alway in the process. Trooper Brown then physically pulled defendant off Trooper Alway.

The two troopers then attempted to take defendant into custody. Defendant, however, refused to cooperate. He would not follow orders; he hid his hands to prevent himself from being handcuffed, and he tried to get up from the ground, despite orders to stay down. A third trooper, Trooper Paul Fry, arrived to assist. Both Trooper Brown and Trooper Fry struck defendant, using closed-hand and knee strikes. Trooper Brown also again used his Taser to "dry stun" defendant. After some struggle, the three troopers managed to handcuff defendant.

Once defendant was handcuffed, the troopers attempted to place him in Trooper Brown's police cruiser for transport. The car—and the other State Police vehicles at the scene—did not have a cage in the back. Protocol would have been to transport defendant in the front passenger seat. But when the troopers attempted to put defendant in the front seat, he thrashed and kicked at them. To stop defendant from kicking, Trooper Fry used a "Welch hitch" and handcuffs on defendant's ankles to secure defendant's legs. Defendant also had blood on his face, and as a precaution, Trooper Fry placed a spit mask on defendant. Throughout the incident, defendant taunted the officers with expletives and name calling.

Realizing that they were not going to be able to get defendant into the vehicle or to safely drive with defendant in the passenger seat, the troopers called for a Montcalm County Sheriff's car, which have cages in the backseat. Deputy Prescott Ingraham responded to the scene. When Deputy Ingraham arrived, he helped Troopers Brown and Fry get defendant into the backseat of the county vehicle. Defendant had gone "limp," and defendant had to be "pretty much carried" to the car by Trooper Brown and Deputy Ingraham. Trooper Fry went to the driver's side of the backseat to pull defendant into the vehicle, as Trooper Brown and Deputy Ingraham remained on the other side of the vehicle to push defendant inside. During the process, defendant kicked at Trooper Brown and Deputy Ingraham. A fourth state trooper, Trooper Austin Wolven, arrived at the scene and defendant also kicked him. Eventually, with four[2] law enforcement officers assisting, defendant was secured into the back seat of the county police car.

Once defendant was in the county vehicle, Deputy Ingraham transported defendant to jail. On the way to jail, defendant continued to kick; he kicked the cage and the back window of the county car. The officers had to stop to secure defendant's legs to prevent him from breaking the window. During the drive, defendant also yelled and called Deputy Ingraham names.

At trial, the five officers involved in defendant's arrest testified about the events in question. The various patrol cars were equipped with in-car videos, and several videos of the incident were admitted into evidence and played for the jury. The jury was also presented with

---

[2] By this time, Trooper Alway had stepped back and was no longer participating in trying to place defendant into a vehicle.

photos of Trooper Alway's and defendant's injuries. And the prosecutor offered expert medical testimony from Dr. Andrew Robin Freeth, who treated Trooper Alway in the emergency room. Dr. Freeth described Trooper Alway's injuries, which included red marks around her neck, swelling and a small laceration over her left eyebrow, and other minor abrasions. Dr. Freeth diagnosed Trooper Alway with a closed-head injury. He also opined at trial that a longer period of strangulation or additional blows to the head could have led to more serious injuries or even death.

The jury convicted defendant of AWIM for his assault on Trooper Alway, five counts of resisting and obstructing arrest, one count for each officer involved in his arrest, and one count of third-degree fleeing and eluding. On October 29, 2020, the trial court sentenced defendant as noted earlier. Defendant appeared at the sentencing hearing remotely via ZOOM. Defendant now appeals by right.

## II. ANALYSIS

On appeal, defendant first contends that the prosecutor presented insufficient evidence to support his AWIM conviction. Specifically, defendant contends that the evidence did not demonstrate beyond a reasonable doubt that he had the actual intent to kill Trooper Alway. To establish the crime of AWIM, the prosecutor must prove "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Brown*, 267 Mich App 141, 147-148; 703 NW2d 230 (2005).

In *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020), this Court recited the principles applicable to reviewing a sufficiency claim:

> This Court reviews de novo whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution.

> The element of intent may be inferred from circumstantial evidence. Because it can be difficult to prove a defendant's state of mind on issues such as intent, minimal circumstantial evidence suffices to establish a defendant's state of mind. A defendant's intent can be gleaned or inferred from his or her actions. [Quotation marks and citations omitted.]

In *People v Taylor*, 422 Mich 554, 568; 375 NW2d 1 (1985), our Supreme Court discussed the evidentiary aspects of proving an intent to kill:

> By saying [that] . . . the intent to kill must be proved, we do not intend to say it must be proved by direct, positive, or independent evidence; . . . the jury may draw the inference, as they draw all other inferences, from any facts in evidence which to their minds fairly prove its existence. And in considering the question they may, and should take into consideration the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made. [Quotation marks and citations omitted.]

Taking into consideration these guiding principles and the evidence (1) that defendant strangled Trooper Alway, leaving red marks around her neck and making it difficult for her to breathe, (2) that he only stopped when the trooper punched him, causing him to release his grip, (3) that defendant repeatedly punched the trooper in the head with haymaker punches that only ceased when Trooper Brown interceded, (4) that the trooper suffered a closed-head injury, (5) that Dr. Freeth opined that Trooper Alway could have died had the assault continued, (6) that defendant told her that he was "gonna fuck [her] up," and (7) that he asked the trooper whether she "want[ed] to die," we conclude that there was more than sufficient evidence to prove beyond a reasonable doubt that defendant assaulted the trooper with an intent to kill her.[3]

Next, defendant presents a cursory argument that his AWIM conviction was against the great weight of the evidence. This issue is unpreserved because defendant failed to move for a

---

[3] In the context of his sufficiency argument, defendant briefly asserts that the trial court abused its discretion by allowing the prosecutor to amend the information to include the AWIM charge after the district court declined to bind defendant over on the AWIM charge and instead bound him over on a lesser charge of assault with intent to do great bodily harm less than murder (AWIGBH). This issue does not appear in defendant's statement of questions presented, meaning that it has not been properly presented for this Court's review and that it need not be considered. See *People v Albers*, 258 Mich App 578, 584; 672 NW2d 336 (2003). It is also insufficiently briefed insofar as defendant fails to address the standards for a bindover or the standards for a circuit court's amendment of the information. By failing to adequately brief the issue, defendant has abandoned it. See *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016). In any event, at this stage, defendant has been convicted by a jury of AWIM, and as discussed, the proofs presented at trial supported that conviction. An appeal following a conviction at trial cannot be used to argue that the proofs at the preliminary examination did not support an AWIM charge, see *People v Wilson*, 469 Mich 1018 (2004), and any potential error by a circuit court in amending an information is otherwise harmless when a defendant has not shown that his trial was unfair or that the verdict was unreliable as a result of the amended information, see MCL 769.26; *People v McGee*, 258 Mich App 683, 697; 672 NW2d 191 (2003).

new trial before appealing. See *People v Lopez*, 305 Mich App 686, 695; 854 NW2d 205 (2014). Moreover, defendant does not develop a separate argument regarding the great weight of the evidence: he simply asserts at the end of his sufficiency argument that, in the alternative, the AWIM conviction was against the great weight of the evidence. See *People v Brown*, 239 Mich App 735, 746 & n 6; 610 NW2d 234 (2000) (recognizing sufficiency and great-weight arguments as "two separate questions" and rejecting a great-weight challenge that merely paralleled the defendant's flawed sufficiency argument). This argument lacks merit.

Defendant has failed to demonstrate that the above-cited evidence showing that he intended to kill Trooper Alway contradicted indisputable physical facts or law, was patently incredible, defied physical realities, was so inherently implausible that a reasonable juror could not believe the evidence, or was so seriously impeached that it was deprived of all probative value. *People v Lemmon*, 456 Mich 625, 643-644; 576 NW2d 129 (1998). Because there were no exceptional circumstances as necessary to support a great-weight argument, and because any issues regarding the credibility of witnesses and the resolution of conflicting testimony were for the jury to determine and not this Court, reversal for a new trial is unwarranted. *Id.* at 642-643. The evidence did not preponderate so heavily against the AWIM verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Musser*, 259 Mich App 215, 218-219; 673 NW2d 800 (2003). As indicated earlier, there was evidence that plainly supported a conclusion by reasonable jurors that defendant intended to kill Trooper Alway. Accordingly, we rule that the verdict was not against the great weight of the evidence.

Next, defendant contends that the trial court erred by allowing KB to testify about defendant's acts of domestic violence on the night in question because this testimony constituted other-acts evidence and the prosecutor failed to provide the notice required by MRE 404(b)(2). Defendant also maintains that the evidence was irrelevant and not substantively admissible under MRE 404(b) and that the trial court erred by failing to provide a limiting instruction.

First, setting aside for the moment the notice issue under MRE 404(b)(2), we find that the evidence was relevant and admissible. Both third-degree fleeing and eluding and obstructing and resisting a police officer require that the officer's actions be *lawful*. See *People v Vandenberg*, 307 Mich App 57, 68-69; 859 NW2d 229 (2014); *People v Grayer*, 235 Mich App 737, 741; 599 NW2d 527 (1999). Consistent with these elements and as part of the jury instructions given in this case, the jurors were instructed that fleeing and eluding required Trooper Alway to be "performing her lawful duties," and similarly, regarding resisting and obstructing, the jury was instructed that the troopers had to be giving "a lawful command," making a "lawful arrest," or "otherwise performing a lawful act." Relevance and materiality are governed by the elements of the charges, the theories of admissibility, and the defenses asserted. *People v VanderVliet*, 444 Mich 52, 75; 508 NW2d 114 (1993), amended by 445 Mich 1205 (1994).[4] By pleading not guilty to resisting

---

[4] The framework for admitting evidence under MRE 404(b) is as follows:

First, the prosecutor must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an

and obstructing a police officer and third-degree fleeing and eluding, defendant put the prosecution to its proofs on all the elements of those offenses. See *id*. at 78 ("In Michigan, as in the federal courts, a plea of not guilty puts the prosecution to its proofs regarding all elements of the crime charged.").

In this case, whether the troopers had a lawful basis for their pursuit and arrest of defendant was at issue, and testimony regarding defendant's domestic assault on KB—as the basis for the troopers' pursuit and arrest of defendant—was relevant and material to the question.[5] Moreover, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under MRE 403. "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). The evidence related to the domestic-violence incident involving KB was relatively brief and not particularly graphic. In contrast, the jury was presented with ample testimony regarding the assault on Trooper Alway, which included strangulation and haymaker punches, as well as video of the assault and photographs of her injuries. In this context, it does not appear that the jury would have given undue weight to evidence relating to the domestic-violence incident, and the probative value of this evidence—as relevant to the lawfulness of the troopers' actions—was not substantially outweighed by the danger of unfair prejudice. See MRE 403. A limiting instruction was not given on the use of the other-acts evidence; however, that does not alter the evidence's admissibility. In the absence of a request for a limiting instruction, a trial court has no duty to sua sponte provide a limiting instruction. *People v Rice (On Remand)*, 235 Mich App 429, 444; 597 NW2d 843 (1999).[6]

---

issue of fact of consequence at trial. Third, under MRE 403, a determination must be made whether the danger of undue prejudice [substantially] outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403. Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000) (quotation marks and some citations omitted; alteration in original).]

[5] Defendant maintains that he did not dispute the lawfulness of the troopers' actions. There was, however, no stipulation that the troopers acted lawfully. In any event, the prosecutor must prove every element beyond a reasonable doubt, regardless whether defendant specifically disputes or offers to stipulate to an element. See *People v Mills*, 450 Mich 61, 69-70; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

[6] Indeed, to the extent that defendant contends that the trial court erred by failing to provide a limiting instruction on the use of other-acts evidence, we conclude that this issue was waived because defendant did not request a limiting instruction, and with the exception of issues unrelated to the other-acts evidence, defendant approved the jury instructions as given. See *People v Miller*, 326 Mich App 719, 726; 929 NW2d 821 (2019).

In sum, contrary to defendant's arguments, the evidence was substantively admissible under MRE 404(b).[7]

With respect to the lack of notice under MRE 404(b)(2), because the evidence of the assault on KB was substantively admissible and because, despite a remand for an evidentiary hearing on the subject, defendant failed to indicate or show that he would have proceeded differently had he received the required notice, we hold that the notice error was not outcome-determinative, i.e., it was harmless, and that reversal is unwarranted. See *People v Jackson*, 498 Mich 246, 278-279; 869 NW2d 253 (2015); *People v Hawkins*, 245 Mich App 439, 453-455; 628 NW2d 105 (2001).[8]

Defendant next contends that the prosecutor engaged in misconduct by impermissibly arguing during closing that defendant "likes to hit women" and trying to paint defendant as a misogynist by emphasizing testimony that defendant called Trooper Alway a "bitch." "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial. They are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008) (citations omitted). And "prosecutors may use 'hard language' when it is supported by evidence and are not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678-679; 550 NW2d 568 (1996). There was testimony by Trooper Alway that defendant called her a "bitch," that he laughed at her during the assault, that defendant essentially taunted her, and that he "appeared to be enjoying himself" as he punched the female trooper in the face. The prosecutor's "hard" and not-so-bland comments were based on the evidence and reasonable inferences arising from the evidence. Therefore, on this unpreserved issue, we discern no plain error, and assuming error to the extent that propensity was being asserted in connection with the assault on KB, we find that defendant has failed to demonstrate the requisite prejudice, i.e., that the presumed error affected the outcome of the proceedings. *People v Carines*,

---

[7] Aside from his assault on KB, defendant contends that evidence of his previous interactions with law enforcement was put before the jury when Trooper Fry testified that KB told the troopers that defendant "typically" went to one of three places when law enforcement were called regarding "an incident" involving defendant. Even assuming error, this sort of vague, isolated, and seemingly inadvertent reference does not warrant relief on appeal. See *People v Wallen*, 47 Mich App 612, 613; 209 NW2d 608 (1973) ("[A]n isolated or inadvertent reference to a defendant's prior criminal activities will not result in reversible prejudice.").

[8] Further, the record is also clear that despite the lack of notice under MRE 404(b)(2), defendant knew KB was a potential witness before trial. She was listed on the Information as a witness, and she was included on defendant's own witness list. During the preliminary examination, testimony was presented—by Trooper Alway—that KB called 911, which prompted a domestic-violence investigation with defendant as the suspect. At the evidentiary hearing on remand, defense counsel confirmed that she knew of KB and that KB could testify that the police had been "called out for a domestic regarding her" and defendant. Thus, there was no "unfair surprise" with respect to KB or her potential testimony in this case. *Jackson*, 498 Mich at 278-279.

460 Mich 750, 763-764; 597 NW2d 130 (1999). The evidence of defendant's guilt on all the charges was overwhelming.

Defendant next argues that defense counsel was ineffective by failing to object to the other-acts evidence under MRE 403 and MRE 404(b), by failing to request a limiting instruction on the use of this evidence, and by failing to object to the prosecutor's improper closing remarks. With respect to the admissibility of the other-acts evidence and the alleged prosecutorial misconduct, there was no error or impropriety; therefore, we conclude that counsel was not ineffective given that failing to raise a meritless or futile objection does not constitute ineffective assistance of counsel. *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015). In contrast, defense counsel could have succeeded on a request for a limiting instruction on the use of the other-acts evidence. See *Rice (On Remand)*, 235 Mich App at 443-444. But during the evidentiary hearing on remand in this case, defense counsel indicated that she did not request an instruction because she did not want to highlight or reemphasize the other-acts evidence to the jury. The decision not to request an instruction can be a matter of trial strategy, and counsel has wide discretion in matters involving trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). Indeed, failing to request a limiting instruction on other-acts evidence may be a strategic decision to attempt to downplay the other-acts conduct. See *Rice (On Remand)*, 235 Mich App at 445. We have no basis or reason to second-guess defense counsel's strategic decision on this matter.

Defendant next contends that the trial court erred by raising political topics like "Blue Lives Matter" during voir dire. In *People v Sawyer*, 215 Mich App 183, 186-187; 545 NW2d 6 (1996), this Court observed:

> A defendant who chooses to be tried by a jury has a right to a fair and impartial trial. The function of voir dire is to elicit sufficient information from prospective jurors to enable the trial court and counsel to determine who should be disqualified from service on the basis of an inability to render decisions impartially. In ensuring that voir dire effectively serves this function, the trial court has considerable discretion in both the scope and conduct of voir dire. What constitutes acceptable and unacceptable voir dire practice does not lend itself to hard and fast rules. Rather, trial courts must be allowed wide discretion in the manner they employ to achieve the goal of an impartial jury. [Quotation marks, citations, and emphasis omitted.]

In this case, among numerous other questions, the jurors were asked about issues related to their feelings and opinions about the police. During voir dire, the trial court noted that almost all the witnesses were police officers, and the court instructed the prospective jurors that testimony from police officers could not be given any additional weight or credibility and must instead be judged "in the same manner as anybody else." The trial court then asked whether prospective jurors would be able to judge a police officer's testimony in this manner. In response, one prospective juror indicated that he would "probably lean" toward giving an officer's testimony a little more weight in light of "recent events." This juror then indicated, however, that he could abide by an instruction not to give a police officer's testimony greater weight.

Following the mention of "recent events," the trial court noted that the prospective juror had "raised a good point here," and the court asked whether anyone thought the police should be

defunded. Two jurors responded that they believed more training for police was warranted, and one of those jurors also suggested implementing additional social services to take the pressure off police; both prospective jurors were later peremptorily challenged by the prosecutor and dismissed. The trial court also asked if the jurors believed that police officers should not be allowed to use force to protect themselves or to arrest someone and whether they were comfortable deciding what constituted an appropriate use of force. The trial court also asked whether anyone had heard of, or was involved with, either Blue Lives Matter or Black Lives Matter, and whether that would affect their decision in this case.[9]

Overall, in a case involving charges of resisting and obstructing a police officer, fleeing and eluding, and AWIM with a police officer as the victim, the trial court did not abuse its discretion by inquiring about the prospective jurors' feelings about police officers and the use of force in the context of an arrest. The trial court's inquiry was a balanced one, aimed at discovering whether prospective jurors had a bias against or in favor of the police. The trial court has wide discretion concerning the scope of voir dire, and it clearly did not exceed that discretion in this case. Indeed, defendant's claim is unpreserved, but defendant has not identified any clear or obvious error by the trial court, and he has not established plain error affecting his substantial rights. See *Carines*, 460 Mich at 763-764.

Next, defendant raises numerous evidentiary issues related to photographs, video footage, and testimony from the troopers about their use of force and restraints and about defendant's injuries. Defendant contends that the evidence was far more prejudicial than probative. According to defendant, the evidence was shocking and so dehumanizing that it deprived defendant of the presumption of innocence. These arguments—the majority of which are unpreserved—lack merit. We review unpreserved evidentiary issues for plain error affecting substantial rights, *Carines*, 460 Mich at 763-764, while preserved evidentiary issues are reviewed for an abuse of discretion, keeping in mind that preliminary questions of law affecting admissibility are reviewed de novo, *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

"Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010) (quotation marks and citation omitted).

> Generally, all relevant evidence is admissible at trial. Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point. However, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation

---

[9] One prospective juror stated that she supported "the blue." This same juror also indicated that she had doubts whether someone would be brought to court if they had not done something illegal. The defense challenged her for cause, and she was dismissed from the jury.

of cumulative evidence. [*People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001) (citations omitted).]

"All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

Defendant challenges testimony about the troopers' use of force and their use of restraints such as the Welch hitch and handcuffs, along with the officers' employment of a spit mask. Defendant also contends that Trooper Brown should not have been allowed to testify that he could have potentially used lethal force against defendant under the circumstances. Defendant further argues that the troopers should not have been permitted to testify that they were not disciplined for their actions. In this regard, during redirect, the prosecutor asked Trooper Fry whether "any disciplinary action" resulted from the incident. Similar to his challenge regarding the troopers' testimonies, defendant maintains that video of the incident should not have been admitted because it showed the troopers' use of force and dehumanizing measures like the Welch hitch and spit mask. Defendant additionally argues that the videos and photos of defendant, which were taken the day after the incident, marked him as guilty and that their admission violated the presumption of innocence.

Defendant was charged, in part, with five counts of resisting and obstructing a police officer. With respect to those charges, the jury was instructed that the prosecution had the burden to prove beyond a reasonable doubt that defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered the officers. The jury was also instructed that obstruction included the use or threatened use of physical force or interference or a knowing failure to comply with a lawful command. The jury was further instructed that defendant "must have actually resisted by what he said or did." We find that the evidence of which defendant complains in the form of testimony, video footage, and photographs, was directly relevant to establishing the offense of resisting and obstructing the five officers. Presenting evidence showing that a defendant is guilty of the charged offense does not deprive the defendant of the presumption of evidence; rather, it is submitted in an effort to overcome the presumption of innocence. The extent of the officers' actions in subduing defendant, i.e., using the Welch hitch, handcuffs, spit mask, etc., demonstrated that defendant was violently and aggressively resisting the officers' efforts to apprehend defendant, necessitating extraordinary measures to gain control of the out-of-control defendant. The degree of force required to restrain defendant was relevant to the jury's assessment of whether defendant resisted and obstructed the police officers. And defendant's criminal acts occurred before he was placed in the patrol vehicle, as he was being put in the cruiser, and while he was being transported. The probative value of the evidence was great, and it was not substantially outweighed by the danger of *unfair* prejudice. MRE 403; *Mills*, 450 Mich at 75.

Defendant essentially seeks to exclude damning evidence of guilt because it overwhelmingly established his guilt.[10]

Moreover, with respect to the testimony by Trooper Brown about lethal force, we note that he actually testified, in response to a juror's question, that he did not "perceive taking out [his] firearm as the appropriate action" when encountering the assault against Trooper Alway. Trooper Brown later added that he did not use his firearm because of the risk of striking Trooper Alway. Defendant effectively acquiesced to the juror's question, and his counsel then used Trooper Brown's response to argue in closing that defendant was not actually attempting to kill Trooper Alway. We thus conclude that the issue was waived. See *People v Carter*, 462 Mich 206, 214-215; 612 NW2d 144 (2000) ("Counsel may not harbor error as an appellate parachute."). In regard to defendant's challenge of the testimony that the troopers were not disciplined, defendant opened the door to this testimony by first asking the troopers about their training regarding lethal force and whether they had complied with their training. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("defendant opened the door to the question when he attempted to undermine his companion's credibility by pointing out that his statements to police were not consistent"). Defendant then argued in closing that the troopers had not complied with their training. See *Carter*, 462 Mich at 214-215 (discussing waiver). Testimony that there were no disciplinary measures taken against the officers directly countered the claims of noncompliance with the troopers' training. With respect to photos and videos of defendant taken the day after the offenses were committed, we find that his injuries were relevant to the jury's assessment of the troopers' use of force against defendant. And, further, some of defendant's specific injuries—like his noticeably swollen hand—were relevant to the force with which defendant struck Trooper Alway. Indeed, the prosecutor referred to the injury to defendant's hand during closing argument,

---

[10] Furthermore, a defendant cannot claim error on appeal on the basis of error to which he contributed by plan or negligence. *People v Gonzalez*, 256 Mich App 212, 224; 663 NW2d 499 (2003), disapproved of on other grounds by 469 Mich 967 (2003). In this case, defendant contributed to the admission of evidence and argument regarding the propriety of the troopers' actions, their use of force, and the injuries defendant sustained as a result. Beginning in opening statements, defense counsel asserted that the troopers needlessly responded en masse in an effort "to line up as many officers as they can and wrap up as many charges as they can" against defendant. During trial, defense counsel cross-examined the troopers about their use of force and restraints during the incident and questioned them about their training on the use of such measures. During closing arguments, defense counsel then used this evidence to argue that the troopers violated their training. For example, she maintained that Trooper Brown should not have punched defendant in the face. Defense counsel also argued that the troopers should have deescalated the situation, but they failed to do so. She asserted that they instead escalated the situation—even after defendant had calmed down somewhat—by using ankle cuffs, the Welch hitch, and the spit mask. Having contributed to any error in the presentation of this evidence—and in fact having endeavored to use this evidence for his own benefit—defendant cannot now be heard to complain on appeal that the introduction of this evidence deprived him of a fair trial. See *id*.

urging the jury to look at the picture of his right hand and to consider the force with which he struck Trooper Alway "to end up with a hand like that." In short, the evidence was relevant and generally admissible. [11]

Next, defendant argues that the best-evidence rule should have precluded trooper testimony, particularly any inconsistent testimony, about events depicted in the video footage because the videos constituted the "best evidence." Defendant also argues that prohibitions on invading the province of the jury should have prevented Trooper Alway from answering questions or offering opinions about the video from her in-car camera.

Contrary to defendant's arguments, the best-evidence rule did not preclude the troopers from testifying about the events on the night in question. Under MRE 1002, to prove the content of a recording, the original recording is required, "except as otherwise provided in these rules or by statute." In this case, to the extent that the prosecutor sought to prove the contents of the videos, those videos were presented in compliance with the best-evidence rule. Defendant, in comparison, appears to assert that the best-evidence rule functions to preclude all other evidence about any fact that may be evinced by an original writing or recording. Under defendant's interpretation of the best-evidence rule, the troopers should not have been allowed to testify about the events on the night in question because there was video available.

Defendant cites no authority for this proposition, and it is without merit. Witnesses with independent knowledge of substantive facts may be called to answer questions about facts within their knowledge, notwithstanding that such information might also be evidenced by a writing or recording. See *Lund v Starz*, 355 Mich 497, 501-502; 94 NW2d 912 (1959); see also *New Jersey*

---

[11] Related to the photos and videos, defendant makes the cursory assertion that he was prejudiced by the admission of these materials because they showed his face bruised and bloody and—as a result of having to wear a mask during trial as a COVID precaution—this was the only time that the jury saw his face. The prosecutor has responded to defendant's mention of masks and COVID with a rationale-basis scrutiny analysis of Michigan's masking mandate. But defendant does not actually raise a constitutional challenge to the masking mandate. To the extent that defendant's argument can be read to incidentally challenge the masking requirements in place during trial, we consider the issue abandoned because it has not been sufficiently briefed by defendant. See *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016). Indeed, in granting defendant's request for a remand, this Court allowed him the opportunity to develop an evidentiary record on the masking requirements and other COVID precautionary measures. That evidentiary hearing established nothing more than that—like everyone else in the courtroom—defendant wore a mask during trial because of the masking mandates in effect at the time of trial in September 2020. His trial attorney testified at the evidentiary hearing that she discussed the COVID measures with defendant before trial, that she did not object to the COVID procedures, and that they went forward with the trial knowing of these procedures because defendant had been "sitting" in jail and he wanted to go to trial. Following the remand, defendant has not sought to file supplemental briefing on the masking mandate, and it remains unclear on what basis, if any, he objects to the masking requirement or any other COVID measure. We consider any COVID issue in this regard to be abandoned, and we will not address this matter further. See *id*.

*Title Guarantee & Trust Co v McGrath*, 239 Mich 404, 408; 214 NW 195 (1927) ("The mere fact that the information was also contained in plaintiff's books of account would not bar the right of the witness to testify to facts which he knew of his own knowledge."). The troopers were of course present during their interactions with defendant, and the best-evidence rule and the existence of the videos did not preclude the officers from testifying about facts within their knowledge based on their interactions with defendant. In fact, multiple forms of evidence might be used for corroboration purposes, see *Mills*, 450 Mich at 76, and conversely, discrepancies between a witness's testimony and a video of an event may cast doubt on a witness's credibility, see *People v Kavanaugh*, 320 Mich App 293, 304 n 12; 907 NW2d 845 (2017). In short, we conclude that the best-evidence rule did not preclude the troopers from testifying about the events on the night in question, and any discrepancies between their testimonies and the videos merely raised credibility issues for the jury. Defendant is not entitled to relief on this basis.

With regard to the video footage, defendant also argues that Trooper Alway should not have been allowed to answer questions or offer opinions about events shown in a video because doing so invaded the province of the jury. This argument also lacks merit. MRE 701 allows lay opinion testimony as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

If a witness is in no better position than the jury in regard to drawing conclusions from a video, it is error for that witness to invade the jury's province by offering opinion testimony about the video. See *People v Fomby*, 300 Mich App 46, 51-52; 831 NW2d 887 (2013). But if there is some reason—such an officer's extensive review of a detailed video—that a witness's opinion testimony "could help the jury discern correctly and efficiently the events depicted in the videotape," it is not improper to allow opinion testimony to provide the jury a clearer understanding of the video. See *id.* (quotation marks and citation omitted). See also *United States v Torralba-Mendia*, 784 F3d 652, 659 (CA 9, 2015) ("[A]n officer who has extensively reviewed a video may offer a narration, pointing out particulars that a casual observer might not see.").

In this case, defendant contends that Trooper Alway improperly invaded the jury's province by offering opinions on matters seen in the video. Contrary to defendant's framing of the issue, the questions about which defendant complains largely did not ask for Trooper Alway's opinion about the video. Instead, she was asked, as a witness to the events in question, about her personal recollection. See MRE 602. There was nothing improper in questioning Trooper Alway regarding how her memory compared to the video; such a comparison was in fact relevant to an assessment of her credibility. See *Kavanaugh*, 320 Mich App at 304 n 12. For example, defendant emphasizes that Trooper Alway recalled defendant saying something about wanting to kill her, but she conceded that defendant did not use the word "kill" in the video footage but instead asked her if she wanted "to die here, bitch?" Again, presentation of the video as a comparison to Trooper

Alway's testimony, as relevant to an assessment of the credibility of her testimony, was not improper. See *id.*[12]

Defendant next argues that Trooper Alway offered improper opinion testimony when she testified that she did not think that defendant would have stopped punching her if Trooper Brown had not arrived. A witness may not offer an opinion on an accused's guilt or innocence, nor may a witness tell a jury how to decide a case. *People v Drossart*, 99 Mich App 66, 79; 297 NW2d 863 (1980). Under MRE 701, witnesses may, however, offer testimony concerning their physical observations and their opinions formed as a result of those observations. *People v Oliver*, 170 Mich App 38, 50; 427 NW2d 898 (1988), mod in part on other grounds 433 Mich 862 (1989). Provided that a lay witness's opinions are based on facts and circumstances within his or her knowledge, a lay witness may express opinions on an actor's state of mind. *Drossart*, 99 Mich App at 73.

In this case, insofar as she opined that defendant would not have stopped hitting her had Trooper Brown not arrived when he did, Trooper Alway rationally offered this opinion on the basis of her personal perceptions, as an individual involved with the altercation with defendant. See MRE 701. She had already described how defendant pinned her to the ground, how he laughed at her, how he made no "effort to get off her" but instead strangled her and punched her in the face, and how he continued to assault her until Trooper Brown arrived and used his Taser. Overall, as the victim of defendant's assault, Trooper Alway was uniquely situated to rationally opine, on the basis of her perceptions, whether defendant appeared to be enjoying the assault and whether he would have continued to assault her if Trooper Brown had not arrived. Given defendant's assertion that he simply wanted to escape arrest, and given the prosecutor's obligation to prove that defendant had the intent to kill, this opinion testimony was helpful to the jury's determination of facts at issue. See MRE 701.

Defendant next argues that the trial court abused its discretion by allowing Dr. Freeth to offer opinions regarding whether Trooper Alway would have suffered more serious injury or even death had defendant not been stopped from strangling her and punching her in the head. Initially, we note that defendant provides no supporting authority for his assertion that Dr. Freeth's expert testimony in this regard was improper. By failing to adequately brief the issue on appeal, defendant has abandoned his challenge to Dr. Freeth's testimony. See *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016). In any event, the argument lacks merit.

Defendant's argument appears to be that Dr. Freeth's testimony regarding whether Trooper Alway could have sustained more serious injuries, or even died, was irrelevant because defendant was unsuccessful in strangling Trooper Alway for a prolonged period and because he only

---

[12] Moreover, to the extent that Trooper Alway offered opinions about things seen or heard on the video, we note that the audio in the video from Trooper Alway's car is not the best quality, and because the video was taken at night, the images during the struggle are not the clearest, meaning that lay opinion testimony was potentially helpful to the jury. MRE 701.

succeeded in punching her approximately five times before he was tased. As noted earlier, evidence is relevant and generally admissible "if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence. Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point." *Aldrich*, 246 Mich App at 114 (citations omitted). In this case, whether defendant intended to kill Trooper Alway was clearly at issue—indeed, it was the primary issue at trial. Relevant to this question was whether the "instrument and means" used by defendant "were naturally adapted to produce death." *Taylor*, 422 Mich at 568. And Dr. Freeth's testimony about whether prolonged strangulation and additional blows to the head could have produced death was helpful to shedding light on this material point, particularly given the evidence that defendant only stopped strangling Trooper Alway because she broke his hold on her neck and that he only stopped punching her because Trooper Brown forced him to stop. The evidence was relevant.

Defendant also appears to contend that Dr. Freeth's opinion testimony was confusing because the jury may have been misled about what actually happened. That is, defendant asserts that he was "convicted of a crime he did not commit due to the erroneous admission of acts not based in reality." This argument lacks merit. The basic facts in this case were not particularly complex. Trooper Alway provided clear testimony about the exact nature of the assault, i.e., the length of strangulation and the number of punches, and the jury saw video footage of the assault. Dr. Freeth also clearly testified about the injuries that Trooper Alway actually suffered, and the jury was presented with photos of her injuries. In this context, there was no meaningful risk that the jury would be confused by questions to Dr. Freeth about the injuries, or even death, that Trooper Alway could have suffered had she, and later Trooper Brown, not succeeded in stopping defendant's efforts to strangle and punch her. In sum, the probative of value of Dr. Freeth's testimony was not substantially outweighed by the risk of confusing or misleading the jury. See MRE 403; *Aldrich*, 246 Mich App at 114 (citations omitted). We conclude that defendant has not demonstrated that the trial court abused its discretion by admitting Dr. Freeth's opinion testimony.

Next, defendant argues that the trial court erred by refusing to instruct the jury on mitigating circumstances in relation to AWIM under M Crim JI 17.4. Defendant preserved this issue by requesting a mitigating-circumstances instruction during trial. See *People v Everett*, 318 Mich App 511, 526; 899 NW2d 94 (2017).

> We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion. Even when instructional error occurs, reversal is warranted only if after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative. The defendant bears the burden of establishing that the error undermined the reliability of the verdict. [*Id*. at 528-529 (quotation marks, citations, and brackets omitted).]

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him. Accordingly, jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *Id*. at 527 (quotation marks and citations omitted). Additionally, a trial court must instruct the jury using the Michigan Model Criminal Jury Instructions when " '(a) they are applicable, (b) they accurately

state the applicable law, and (c) they are requested by a party.' " *People v Rosa*, 322 Mich App 726, 739; 913 NW2d 392 (2018), quoting MCR 2.512(D)(2). In this case, with regard to the AWIM charge, defendant requested an instruction on mitigating circumstances under M Crim JI 17.4, which provides:

> (1) The defendant can only be guilty of the crime of assault with intent to commit murder if [he / she] would have been guilty of murder had the person [he / she] assaulted actually died. If the assault took place under circumstances that would have reduced the charge to manslaughter if the person had died, the defendant is not guilty of assault with intent to commit murder.

> (2) Voluntary manslaughter is different from murder in that for manslaughter, the following things must be true:

> (3) First, when the defendant acted, [his / her] thinking must have been disturbed by emotional excitement to the point that an ordinary person might have acted on impulse, without thinking twice, from passion instead of judgment. This emotional excitement must have been caused by something that would cause an ordinary person to act rashly or on impulse. The law does not say what things are enough to do this. That is for you to decide. . . . .

> (4) Second, the killing itself must have resulted from this emotional excitement. The defendant must have acted before a reasonable time had passed to calm down and before reason took over again. The law does not say how much time is needed. That is for you to decide. The test is whether a reasonable time passed under the circumstances of this case.

> (5) If you find that the crime would have been manslaughter had the person died, then you must find the defendant not guilty of assault with intent to murder [and decide whether (he / she) is guilty of any lesser offense].

The trial court denied the request for the instruction, reasoning that the instruction was unwarranted because (1) defendant had time to cool off after his altercation with [KB] and was not in the heat of passion when he first encountered Trooper Alway, (2) defendant had additional time to reflect between his first encounter with Trooper Alway and when she again confronted him after he crashed his car into a tree, and (3) the facts showed that the arrest was lawful and Trooper Alway acted "entirely within her authority" during the incident. We hold that the trial court correctly recognized that as a matter of law, a police officer's performance of her duty in a lawful manner cannot provide provocation that would mitigate a killing to manslaughter or constitute mitigating circumstances in the context of AWIM charge.

More than 100 years ago, the Michigan Supreme Court recognized that individuals have a "duty to submit" to a lawful arrest and that the law will protect officers lawfully making that arrest. See *People v Durfee*, 62 Mich 487, 495; 29 NW 109 (1886), superseded by statute on other grounds as recognized in *People v Carpenter*, 464 Mich 223, 234 n 7; 627 NW2d 276 (2001). In this context, an individual who is aware of an officer's authority and intentions and who kills the officer lawfully carrying out his or her duty will be guilty of murder, *not* manslaughter, because the

individual has a duty to submit to the arrest. See *Durfee*, 62 Mich at 494-496. Persuasive authority also more specifically recognizes that

> [a] lawful arrest or detention in a lawful manner[13] by an officer or private person will not constitute an adequate provocation for heat of passion reducing the grade of the homicide to manslaughter, and the same is true of other lawful acts of officers while in the discharge of their duties. [40 CJS, Homicide, § 120.]

See also 2 LaFave, Substantive Criminal Law, § 15.2(b)(4) (3d ed) ("[A] *lawful* arrest cannot constitute sufficient provocation.").[14] Defendant has identified no pertinent authority—nor are we aware of any authority—to support the proposition that a lawful arrest carried out in a lawful manner can provide adequate provocation to reduce murder to manslaughter or, by analogy, to mitigate an AWIM charge to a lesser assault charge.

Turning to the facts of this case, we find that defendant appears to concede the lawfulness of the arrest and the lawfulness of Trooper Alway's conduct during the arrest.[15] He urges this Court to ignore the lawfulness of her conduct, asserting that "the lawfulness of Alway's actions and the lawlessness of [defendant's] were not relevant to [defendant's] right to have malice mitigated." Defendant is mistaken in this regard. As recognized by the trial court and supported by *Durfee* and the persuasive authorities cited above, Trooper Alway's lawful arrest of defendant in a lawful manner could not constitute adequate provocation to mitigate his AWIM charge to a lesser assault charge. Thus, we conclude that the trial court did not err in its legal analysis of mitigating circumstances and that it did not abuse its discretion by ruling that M Crim JI 17.4 did not apply to the facts of this case.

Finally, defendant argues that he is entitled to resentencing on three grounds. First, he asserts that resentencing is warranted because he was denied the right to be physically present for sentencing. Second, he contends that the trial court improperly sentenced him pursuant to a local sentencing policy rather than sentencing him individually based on a consideration of the recommended minimum guidelines range as a whole, thereby violating the principle of proportionality and the Sixth Amendment. Third, he maintains that resentencing is required with regard to his fleeing-and-eluding conviction because the trial court improperly scored offense variables (OV) for fleeing and eluding on the basis of facts related to his AWIM conviction.

---

[13] "The killing may be only manslaughter where a legal arrest is attempted in an unlawful manner, as where the passion of the accused is aroused by the employment of unnecessary violence." 40 CJS, Homicide, § 120.

[14] In contrast, an *unlawful* arrest *may*, depending on the specific facts of a case, provide provocation to mitigate murder to manslaughter. See *People v Eisenberg*, 72 Mich App 106, 116-117; 249 NW2d 313 (1976).

[15] On appeal, as discussed earlier in this opinion, defendant has characterized actions by other troopers as involving excessive force and violating the officers' training. None of defendant's complaints, however, relate to Trooper Alway and her conduct leading up to, and during, defendant's assault on her.

Defendant failed to raise his physical-presence argument in the trial court; therefore, this issue is unpreserved and reviewed for plain error. See *People v Anderson*, ___ Mich App ___, ___; ___ NW2d ___ (2022); slip op at 4. Although defendant is correct that he had the right to be physically present at sentencing, he has not shown that the plain error in conducting his sentencing by virtual appearance via Zoom affected his substantial rights. Accordingly, defendant is not entitled to relief on this basis.

A defendant has a constitutional right to be physically present during sentencing for a felony conviction. See *People v Heller*, 316 Mich App 314, 318; 891 NW2d 541 (2016). Recently, in *Anderson*, ___ Mich App at ___; slip op at 4-8, this Court addressed the right to be physically present in the context of a defendant's virtual appearance at sentencing during the COVID-19 pandemic. Recognizing that the defendant neither waived his right to be present nor objected to holding the proceedings by way of Zoom video conferencing, this Court concluded that the issue was unpreserved and that the defendant had established a plain, constitutional error in the deprivation of his right to appear at sentencing. See *id*. at ___; slip op at 6. But this Court also determined that the defendant had not shown that the plain error affected his substantial rights where (1) the defendant did not assert that the virtual proceedings affected the trial court's determination of an appropriate sentence; (2) the defendant's "actual participation in the sentencing" via Zoom did not restrict the defendant's ability to put forth evidence and argument regarding sentencing, and (3) the remote participation did not "affect the composition of the record, or otherwise undermine the fairness of the criminal proceeding as a whole." *Id*. at ___; slip op at 6-7.[16]

Applying *Anderson* in this case, there is similarly no evidence, inference, or indication to find that defendant's treatment would likely have been different had he appeared in-person for sentencing. As in *Anderson*, defendant appeared virtually at sentencing; his attorney was present in the courtroom. Neither defendant nor his attorney expressly waived defendant's right to physically appear in the courtroom; however, they also failed to object to the use of virtual

---

[16] For example, in *Anderson*, this Court noted that the defendant had the opportunity to allocute during sentencing; his counsel was in the courtroom to address inaccuracies in the presentence investigation report (PSIR), and the trial court "fully explained" its sentence. *Id*. at ___; slip op at 8. There were also no technological issues affecting communication, i.e., "the trial court appeared to have no difficulty listening" to the defendant. *Id*. The judge who sentenced defendant was the judge who presided over the trial, and the record showed that "the trial court dealt with defendant in a thoughtful, humane, and respectful way" throughout the case. *Id*. at ___; slip op at 7. In a footnote, this Court also observed that the process was designed to ensure "the fairness and integrity of defendant's sentencing proceeding particularly in light of the circumstances of the global pandemic." *Id*. at ___ n 4; slip op at 8 n 4. Given all these circumstances, the *Anderson* panel concluded that there was "no evidence, inference, nor indication that defendant's treatment likely would have been different had he been face-to-face with the sentencing judge." *Id*. at ___; slip op at 8.

proceedings. The virtual sentencing was held during the global COVID-19 pandemic and appeared to have been conducted with fairness and integrity in light of the circumstances created by the pandemic. As in *Anderson*, defendant had the opportunity to allocute. His attorney also advocated on his behalf, pointing out potential inaccuracies in the PSIR and asking the trial court to consider a lesser sentence. There are no indications that there were any technological difficulties or anything else that impacted communications during the hearing. The trial court fully explained the reason for the sentence that it imposed, and the trial judge, who was the same judge who presided over the trial, treated defendant with respect throughout the proceedings.[17] Overall, there is no evidence and no inference to be drawn to support that defendant's treatment likely would have been different with a face-to-face sentencing. Consequently, defendant has not shown that the error in his physical absence from sentencing affected his substantial rights, and he has not demonstrated that he is entitled to relief on this argument.[18] Moreover, in light of the facts regarding the sentencing procedure alluded to above that fully protected defendant's rights during the pandemic, we conclude that even if the forfeited error constituted a structural error, the prosecution overcame the presumption that the error seriously affected the fairness, integrity, or public reputation of the proceedings. See *People v Davis*, 509 Mich 52, 75; ___ NW2d ___ (2022).[19]

Defendant's local-sentencing-policy argument also lacks merit. A sentence will be held invalid "when it is beyond statutory limits, when it is based upon constitutionally impermissible grounds, improper assumptions of guilt, a misconception of law, or when it conforms to local sentencing policy rather than individualized facts." *People v Miles*, 454 Mich 90, 96; 559 NW2d

---

[17] Defendant contends on appeal that the trial court's comments during sentencing suggest that the court lost sight of defendant's "personhood." Specifically, defendant notes that the trial court characterized defendant as a danger to the community and a "sick individual." In context, however, the trial court plainly expressed its opinions of defendant based on the videos of the assaults, the other evidence produced at trial, and defendant's lengthy criminal record. These kinds of opinions—formed by the trial court as a result of the judicial process—do not demonstrate that the court failed to exercise fair judgment during sentencing or to treat defendant with respect. See generally *People v Johnson*, 315 Mich App 163, 196; 889 NW2d 513 (2016).

[18] We note that in his motion to remand, defendant included the physical-presence issue as a matter on which he wanted to develop a further evidentiary record. This Court denied the request to remand on this issue without prejudice to the case call panel's determining that a remand is necessary. See *People v Stapp*, unpublished order of the Court of Appeals, entered November 22, 2021 (Docket No. 355976). Considering defendant's offer of proof, we note that he does not allege that he could present facts of the kind that would support the position that his physical absence affected the sentencing outcome as required by *Anderson*. In these circumstances, we see no need for a remand for further factual development on this issue. Defendant's request for a remand on this issue is again denied. See MCR 7.211(C)(1)(a).

[19] On January 12, 2023, our Supreme Court heard oral arguments on the issue regarding whether denial of a defendant's right to be physically present at sentencing constitutes a structural error. *People v Enciso*, 509 Mich 937 (2022) (ordering oral argument on the matter relative to an application for leave).

299 (1997). In *People v Chapa*, 407 Mich 309, 310-311; 284 NW2d 340 (1979), our Supreme Court held that the sentencing judge erred in limiting his sentencing discretion in accordance with a stated local "policy of mandatory prison terms for heroin dealers despite . . . personal qualifications for probation or leniency." More recently, in *People v Pennington*, 323 Mich App 452, 466; 917 NW2d 720 (2018), this Court concluded that a trial judge's "policy of sentencing all defendants who go to trial to the top of the sentencing guidelines range is fundamentally inconsistent with the principle of individualized sentences."

When considering whether a trial court has abdicated its sentencing discretion in favor of a local policy, the trial court's remarks and the sentencing proceedings should be reviewed as a whole, considering all the factors and circumstances on which the trial court relied in crafting a sentence. See *People v Munson*, 109 Mich App 39, 41; 310 NW2d 810 (1981); *People v Hooks*, 101 Mich App 673, 682; 300 NW2d 677 (1980). In *Munson*, 109 Mich App at 41, the sentencing judge stated " 'that any involvement with drugs earns either time in jail or in prison[.]' " The *Munson* panel ruled:

> [W]e disagree with the defendant's application of the above stated law [under *Chapa*] to the instant case. We do not find that the one statement, albeit ill-advised, so overrode all other valid sentencing considerations as to void the sentencing on that basis. The record clearly demonstrates that the judge carefully pointed out different facets of the crimes and defendant's record so as to render individualized sentences. Defendant was permitted to allocute at length concerning his own rehabilitation; the court considered a presentence report; the court on the record considered sentencing factors and mitigating circumstances; and the resultant sentences were well below the maximum sentences allowed by the law. When the judge's comment is viewed in light of the totality of the sentencing proceedings, we are convinced that the judge did not base his decision solely on the above comment so as to evidence lack of exercise of discretion in individualizing defendant's sentences. [*Id.* at 41-42 (citation omitted).]

In this case, defendant contends that the trial court improperly followed a local sentencing policy that involves looking to the middle of the guidelines range. This purported practice was first mentioned by the prosecutor, who argued, in part, as follows:

> And it's our position, Judge, and this Court has said it on a number of occasions that, you know, look at the guideline range. I mean, he's [a fourth-offense habitual offender], which he's been obviously convicted of now, so the guideline range is quite significant. And this Court has always said we look—we start in the middle and go up or down depending on the facts. If this case doesn't warrant an upward, you know, upward of the middle of the guidelines, which is what the recommendation of 50 years on the minimum is, I don't know what does. We're asking that you follow that recommendation. We believe it is time that the defendant be incarcerated for a long period of time to ensure the safety of the community.

The trial court later mentioned this begin-in-the-middle-of-the-guidelines approach when sentencing defendant. But contrary to defendant's argument, a review of the trial court's

-21-

sentencing explanation—as a whole and in the context of the totality of the proceedings—reveals that the court did not abdicate its sentencing discretion in favor of a mandatory local sentencing policy. Instead, the trial court exercised its discretion to tailor a proportionate, individualized AWIM sentence. When imposing the sentence, the trial court reasoned as follows:

> Okay. Mr. Stapp, I think the parties have covered much of what the Court has already noted from the PSI. Sir, you stand before the Court this morning with four prior felonies, 18 prior misdemeanors. And really, what you—what you as a person, I think, boil down to in a presentence report in black and white writing here I think can be summarized from your history. I'm gonna read from the report here. It dates back to 1991 back when you were still a juvenile. You've got breaking and entering. And then, as an adult you have convictions that are replete with assaultive crimes. Domestic violence three different times. [Resisting and obstructing] of a police officer three different times. [Criminal sexual conduct] in the first degree, which you were sent to prison. You're now on the registry for, which was a violent crime.

> Sir, you just continue to demonstrate that you are a threat to the community. You're a threat to law enforcement. Your history suggests that, and this conviction is no different. And you're a danger to the community. And it's accurate that you shouldn't have the opportunity to continue to be a danger to the community. And I don't know how else to put it, I've said it to other people before you, you are what your record says you are. I don't know which football coach said that. But when the Court receives a [presentence investigation report], you're one of those guys that it's very accurate, you are what your record says you are, and you are a danger to the community.

> And I don't also want to lose sight of the fact that thankfully Trooper Alway is recovered but it doesn't minimize what you did that night. The fact of the matter is if she hadn't received help, who knows where this would be today. If she hadn't, what I would characterize fought you with just great courage and bravery, who knows where we would be today.

> And the other thing that I can take from having sat through the trial is you seem to take great pleasure in assaulting people, and that was clear from the video. You're a sick individual, sir, and I don't know that I've ever seen a video that would suggest somebody enjoyed so much what they were engaged with at the time. You just simply can't be in the community. I'm gonna follow this recommendation, sir. It's appropriate. [The prosecutor] is correct when we talk about the middle of the guidelines. Even the recommendation is for more of the middle of the guidelines and that is clearly appropriate. You've earned this sentence.

In contrast to *Chapa*, the trial court did not treat a middle-of-the-range minimum sentence as mandatory, nor did the court abdicate its discretion to tailor a sentence specific to defendant and his crimes. Instead, the record shows that the trial court took into consideration specific factors related to the offenses, such as the severity of defendant's actions and the apparent enjoyment of his assaultive behavior, as well as information related to defendant as an individual, including his

long history of violent crimes. From this, the trial court determined that defendant posed a danger to the community. And ultimately the trial court tailored an individualized sentence to defendant, making clear that the specific sentence imposed was proportionate to defendant and his offenses. In sum, considering the trial court's remarks in their totality and in context, we hold that the AWIM sentence imposed by the court was valid and not the product of a local sentencing policy.

Moreover, contrary to defendant's arguments on appeal, there was no Sixth Amendment violation, and the trial court fulfilled its obligation under *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015), to consult the guidelines range and to take it into account when sentencing defendant. Indeed, the trial court sentenced defendant within the recommended minimum sentence range under the legislative guidelines. Defendant presents a cursory assertion that the AWIM sentence was disproportionate, but a sentence within the guidelines range is presumed to be proportionate. *People v Odom*, 327 Mich App 297, 315; 933 NW2d 719 (2019). And absent a scoring error or reliance on inaccurate information, we must affirm defendant's sentence without further consideration of its reasonableness. See MCL 769.34(10); *People v Anderson*, 322 Mich App 622, 636; 912 NW2d 607 (2018).

Finally, defendant argues that the trial court improperly assessed points for OVs 3, 4, 9, and 13 with respect to defendant's fleeing-and-eluding conviction on the basis of facts related to defendant's AWIM conviction. But even assuming error in the scoring of these OVs, the presumed errors were harmless, and defendant is not entitled to resentencing on his fleeing-and-eluding conviction.

AWIM is a Class A offense. MCL 777.16d. In comparison, third-degree fleeing and eluding is a Class E felony. MCL 777.12e. When, as in this case, offenses are of a different crime class and the sentences are concurrent, the trial court need only score the guidelines for the offenses in the highest crime class. *People v Lopez*, 305 Mich App 686, 690-691; 854 NW2d 205 (2014). In other words, a trial court is "not required to independently score the guidelines for and sentence the defendant on each of his concurrent convictions if the court properly scored and sentenced the defendant on the conviction with the highest crime classification." *Id*. at 690. See also MCL 771.14(2)(e). As a matter of law, only the higher-level offense needs to be scored, and resentencing related to lower-level offenses is not required "because a shorter concurrent sentence for the lower-level offense would expire before the longer concurrent sentence for the higher-level offense." *People v Reynolds*, 508 Mich 388, 394-395; 975 NW2d 821 (2021).

In this case, defendant does not dispute that the trial court properly scored and sentenced defendant on the AWIM conviction, a Class A offense. Consequently, the trial court was not even required to independently score the guidelines for a lower-level Class E felony, such as third-

degree fleeing and eluding.  Given that the sentences are concurrent, the guidelines range for the Class A offense subsumes the guidelines range for the Class E offense, and there is no tangible benefit or reason to reconsider the Class E guidelines.  In fact, defendant's shorter, concurrent sentence for fleeing and eluding—6 to 20 years—will expire long before his 50- to 75-year sentence for AWIM.   See *Reynolds*, 508 Mich at 394-395.   We conclude that in these circumstances resentencing is not required even assuming scoring errors in relation to third-degree fleeing an eluding because any errors were harmless.  *Id.*

We affirm.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ James Robert Redford